**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ESQUIRE DEPOSITION SOLUTIONS, LLC,** | **CIVIL ACTION NO.** |
| Plaintiff, | **JUDGE** |
| v. | **MAGISTRATE** |
| **LOUISIANA COURT REPORTERS ASSOCIATION, PAUL A. BONIN, VINCENT P. BORRELLO, JR., MILTON DONEGAN, JR., SUZETTE MAGEE, KIMYA M. HOLMES, JOHN H. ANDRESSEN, MAY F. DUNN, ELIZABETH C. METHVIN, and LAURA PUTNAM** | **SECTION** |
| Defendants. | |

## COMPLAINT

Plaintiff, Esquire Depositions Solutions, LLC ("Esquire"), files this Complaint against defendants, Louisiana Court Reporters Associations (the "LCRA"), Vincent P. Borrello, Jr., Milton Donegan, John H. Andressen, Mary F. Dunn, Susan Magee, and Elizabeth Methvin in their individual capacities (collectively, the "Court Reporters"), and Paul A. Bonin, Vincent P. Borrello, Jr., Milton Donegan, Jr., Suzette Magee, Kimya M. Holmes, John H. Andressen, May F. Dunn, Elizabeth C. Methvin, and Laura Putnam, in their official capacities as members of the Louisiana Board of Examiners of Certified Shorthand Reporters (collectively, the "Board").

## INTRODUCTION

1.

In 1995, at the urging of the LCRA and other market participants, the Louisiana Legislature passed House Bill 1534, amending Code of Civil Procedure Article 1434(A). Peter Gilberti, an officer and director of the LCRA, would later explain to the Board that the legislation prohibited court reporters from offering volume-based price discounts to customers and had been motivated by "the sweet deals [that] were being made to big insurance and defense firms." *See* Transcript of January 20, 2012 Board Meeting at 148:14-149:9 (Exhibit 1).

2.

However, as amended, Article 1434(A) made no mention of volume-based price discounts or "sweet deals." Nor did it contain any other language to suggest that the Louisiana Legislature intended to displace competition in the setting of court reporter rates.

3.

Nevertheless, as part and parcel of an agreement to unreasonably restrain price competition for court reporting services in Louisiana, the LCRA agreed with its members on the Board – the Court Reporters – that LCRA members would not engage in volume-based price discounting, that the Court Reporters would exercise their voting control on the Board to effect and police their conspiracy, and that LCRA, the Court Reporters, and its members would use meetings of the Board as cover for discussing ways to suppress price competition among court reporters.

4.

The LCRA and the Court Reporters caused the Board to: (1) pressure other court reporters in Louisiana to abide by their agreement not to engage in volume-based price discounting; (2) initiate investigations against court reporters and court reporting firms that

engaged in volume-based discounting and any court reporters who do business with them; (3) fund the investigations of court reporting firms and court reporters with the licensing and annual renewal fees paid by Louisiana court reporters; (4) use its subpoena power to extract assurances from insurance companies that they will not enter into price discounting agreements with court reporters; (5) admonish law firms and lawyers to disregard client instructions to use national court reporting firms, and (6) provide the LCRA with a public forum to solicit agreements to suppress price competition and refuse to do business with national court reporting firms.

5.

The LCRA and the Court Reporters also used the Board to facilitate their price fixing agreement in other ways. Most recently, at the direction of the Court Reporters, the Board charged an ad hoc committee to investigate how to increase rates for court reporters in Louisiana and appointed the Court Reporters as the sole members of the committee. In response, the Court Reporters used Facebook group pages as a communications device for exchanging current and forward-looking rate information with competitors and discouraging competing court reporters from lowering their rates for insurance companies. The Court Reporters also scheduled a public meeting of the ad hoc committee to discuss "How to increase rates?" and posted an agenda to its website announcing its intention to discuss "How to increase rates?" at their August 2016 meeting. While the Court Reporters postponed the meeting of their ad hoc committee in response to litigation filed by another court reporting firm, the Court Reporters have met regularly to discuss how to raise prices for court reporter services since at least January 20, 2012.

6.

In addition to coopting the Board, the LCRA and the Court Reporters exchanged price information and other competitively sensitive information directly among themselves, discussed

and implemented strategies and methods for raising rates for court reporter services, encouraged and extracted agreements from other court reporters not to engage in price discounting and to cease doing business with national court reporting firms, and actively policed their conspiracy.

7.

These actions were closely followed by the industry and were neither required nor authorized by the Louisiana Legislature.  Rather, the Board acted at all times without state supervision with the express purpose of suppressing price competition and excluding court reporting firms, such as Esquire, from the Louisiana market for court reporter services.

8.

Esquire seeks injunctive relief against the Board, the Court Reporters, and the LCRA under federal antitrust laws and a judgment against the LCRA and Court Reporters for compensatory and treble damages under the same laws.  Esquire also seeks a declaration that the United States Constitution prohibits the Board from enforcing any statutes or regulations purporting to prohibit court reporters from offering price discounts or dealing with court reporting firms that do.  Esquire does not seek an award of damages against the Board.

## JURISDICTION AND VENUE

9.

This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Esquire's claims arise under federal law, specifically, Article I, Section 8 of the United States Constitution; the Fourteenth Amendment of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Clayton Act, 15 U.S.C. § 15(a), 26; and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court also has jurisdiction under 28 U.S.C. § 1343.

10.

Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

## PLAINTIFF

11.

Plaintiff, Esquire Depositions Solutions, LLC, is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Esquire provides court-reporting services to clients across the United States, including in Louisiana, in depositions, arbitrations, and other proceedings, and has been and will continue to be injured in its business and property by the conduct of Defendants.  Esquire also is a consumer of court reporting services in Louisiana.

## THE BOARD

12.

Defendants Paul A. Bonin, Vincent P. Borrello, Jr., Milton Donegan, Jr., Suzette Magee, Kimya M. Holmes, John H. Andressen, May F. Dunn, Elizabeth C. Methvin, and Laura Putnam are all adult natural persons and the current members of the Board.

13.

The Board is a regulatory body created "for the purpose of encouraging proficiency in the practice of shorthand reporting as a profession, promoting efficiency in court and general reporting, and … establishing a standard of competency for those persons engaged in it."  La. R.S. 37:2551(A).   The Board is charged with "aid[ing] in all matters pertaining to the advancement of the science of shorthand reporting," a task that includes "the development, implementation, and enforcement of continuing education requirements and such matters as concern th[e] relations [of certified shorthand reporters] with the public."  *Id.* § 2553(A).

14.

To carry out these duties, the Board was given certain enforcement authorities.  The Board can, without the need of instituting court proceedings, "suspend or revoke" the certified-court-reporter certificate that a person must hold to practice court reporting in Louisiana.  *Id.* § 2557(A).  The Board also can issue a cease-and-desist order to a person practicing as a court reporter without a license.  *Id.*  Alternatively, or to impose sanctions other than suspension or revocation of a person's certified-court-reporter certificate or a cease-and-desist order to a person practicing without a certificate, the Board may "apply to any court of competent jurisdiction for a writ of injunction to restrain violation of this chapter."  *Id.* § 2557(d).

15.

The Board is composed of and controlled by active market participants.  Six of the nine members of the Board are court reporters subject to the regulatory authority of the Board and are engaged in the business of providing court-reporting services.  These market participants control the agenda of the Board and its committees and direct the Board's business.

16.

The Board's actions have not been supervised by independent state officials, that is, persons who are not participants in the court reporting industry.

**THE COURT REPORTERS**

17.

Messrs. Borrello, Donegan, and Andressen and Ms. Dunn, Magee, and Methvin are certified shorthand court reporters and have a direct financial and economic interest in the decisions, rules, and policies of the Board.  At all relevant times, they served as members of the Board at the same time that they were members, officers, or directors of the LCRA and held their

own pecuniary interests and those of the LCRA above their obligations to the Board. Each of them actively participated in the conspiracy with the LCRA in their individual capacities.

### THE LOUISIANA COURT REPORTERS ASSOCIATION

18.

Defendant, Louisiana Court Reporters Association, is a Louisiana nonprofit entity located at 1315 Bonnabel Blvd., Metairie, Louisiana 70005. On its website, the LCRA describes itself as "an organization that educates, protects, and promotes the court reporting profession in Louisiana" and "has a membership that is the largest in the Louisiana court reporting profession." The LCRA is closely watched by court reporters in Louisiana and its members collectively represent an overwhelming percentage of the court reporters in Louisiana. Court reporters also know that the LCRA controls the Board through the Court Reporters. Through its representation of most court reporters in Louisiana and control of the Board, the LCRA has the ability to control prices and exclude competitors from the marketplace.

19.

Defendant Vincent Borrello, who is a member of the Board, also is the immediate Past President of the LCRA. Board members Messrs. Donegan and Andressen, and Ms. Dunn, Magee, and Methvin are members of the LCRA and actively worked with the LCRA to discourage price discounting by using their voting power on the Board to prohibit court reporters in Louisiana from offering volume-based discounts or working with court reporting firms that did.

20.

Peter Gilberti has at all relevant times served as an officer and director of the LCRA and currently serves in the capacity of Treasurer.  He is also the registered agent for the LCRA and served as the principal spokesperson for the LCRA at meetings of the Board.  Mr. Gilberti, together with the Court Reporters, actively worked with the LCRA to discourage price discounting for court reporting services in Louisiana and exclude national court reporting firms from the State.

**VOLUME-BASED PRICE DISCOUNTING BY COURT REPORTERS**

21.

Esquire offers negotiated rates for court-reporting services across the country to insurance companies, large companies, government agencies, regulatory authorities, educational institutions, and other high volume users of such services.  To obtain these discounts, customers enter into nonexclusive preferred-provider agreements with Esquire in which they agree to utilize Esquire for all or some of their court reporting needs.  The economies of scale and other efficiencies arising from this commitment reduce the costs associated with supporting the customer and permit Esquire to pass on those savings to the customer.  They also permit Esquire to invest in data security, regulatory compliance, and other innovative products which, in turn, allows litigants to move through the litigation process efficiently saving them time and money.

22.

Preferred-provider engagements are attractive to customers and procompetitive.  They are commonly used throughout the industry in the United States without any risk to the impartial administration of justice.  They result in lower prices and higher quality service.  They also reduce transaction costs by eliminating the need for frequent purchasers of court reporting services to spend time identifying, contracting with, and monitoring multiple court reporters and

litigation support firms.  For example, Esquire offers data security for all personal health information and personally identifiable information, periodic reporting on litigation spending, consolidated billing, a repository for transcripts, and a central point of contact for scheduling and any other issues arising in connection with a user's court-reporting needs.

23.

Solo and small-firm court reporters in local areas who contract to provide services on behalf of Esquire also enjoy significant benefits.  Esquire provides these reporters with significant opportunities to increase their volume of work and reduce their administrative burden and expenses.  For example, in most jurisdictions, Esquire performs and incurs the associated cost of many of the "back office" tasks that the reporter otherwise will have to perform personally, including formatting, indexing, finalizing, and distributing the deposition (or other proceeding) transcript.  Esquire also handles invoicing and collection with respect to the customer of the court-reporting services and ensures that the local court reporters who work for Esquire are paid timely, even if the customer does not pay timely or failed to pay altogether.

24.

Preferred provider arrangements also support a significant public interest and the administration of justice by reducing the high cost of litigation, mitigating the significant administrative costs which law firms are frequently required to absorb by their clients, and ensuring that deposition transcripts comply not only with state laws governing court reporting services, but also federal privacy requirements under the Health Insurance Portability and Accountability Act of 1996 and the Gramm-Leach Bliley Act, each as amended.

25.

Esquire has been forced to exempt Louisiana from its preferred provider agreements because of the anticompetitive restraints complained about in this Complaint.

## THE STATUTORY FRAMEWORK

### 26.

The plain language of Article 1434 does not articulate, let alone clearly articulate, an intention by the Louisiana Legislature to displace competition in the setting of court reporter rates.  As amended, Article 1434 provides that "[a] deposition shall be taken before an officer authorized to administer oaths, who is not an employee or attorney of any of the parties or otherwise interested in the outcome of the case."  Article 1434(A)(2) defines an "employee" as:

> a person who has a contractual relationship with a party litigant to provide shorthand reporting or other court reporting services and also includes a person employed part or full time under contract or otherwise by a person who has a contractual relationship with a party litigant to provide shorthand reporting or other court reporting services.

All dealings between court reporters and their customers involve a sale of services and, therefore, some form of contracting.  Consequently, a literal reading of the statute would prohibit all engagements of court reporters by private parties or their lawyers.  The types of contracting the Louisiana Legislature intended to proscribe by the statute was left entirely unsaid.

### 27.

For example, the statute lacks any definition of "contract" or other standards to distinguish between lawful and unlawful contracts.  It provides no guidance about which of the following alternatives is correct: (1) the statute prohibits all agreements between court reporters and party litigants; (2) the statute requires party litigants to engage court reporters through their attorneys; (3) the statute permits an agreement for a single engagement but prohibits long-term agreements; (4) the statute prohibits court reporters from offering volume-based price discounts

or service concessions to frequent customers; (5) the statute prohibits referrals from court reporting firms; or (6) the statute prohibits a combination of the above or something else entirely.

28.

Although the language in the statute does not mention price discounting, the Board has declared that it prohibits agreements between court reporters and customers which offer volume-based price discounts or service concessions to frequent customers and that court reporters cannot accept assignments from court reporting firms for customers receiving such discounts.

29.

The Board also has interpreted the statute to extend to assignments paid for by insurance companies on behalf of their insureds, even if the insurance company is not a party to the suit.

30.

These statutory interpretations are not codified in any written or publicly available rules or regulations.  Further, in interpreting Article 1434(A), the Board conducted no hearings or surveys, collected no evidence, and created no factual record to support the conclusion that prohibiting price discounting and volume-based concessions achieves a legitimate state interest.

31.

The closest the Board has come to articulating a statutory or regulatory basis for prohibiting price discounts is to say in a court filing that Article 1434 prohibits "unethical" contracts.  The Code of Ethics for court reporters is set forth in 46 La. ADC Pt XXI, § 1301.  The only ethical rules potentially applicable to pricing are contained in Subsections (B)(7) and (9). Nothing in these regulations can reasonably be interpreted to prohibit volume-based discounts.

32.

Subsection (B)(7) provides that a court reporter shall "determine fees independently, except when established by statute or court order, entering into no unlawful agreements with others, whether for services or charges." 46 La. ADC Pt XXI, § 1301(B)(7).

33.

Subsection (B)(9) addresses concerns about corruption and bribery and provides that with certain limited exceptions, the court reporter shall "refrain from giving, directly or indirectly, any gift, incentive, reward, or anything of value to attorneys, clients, witnesses, insurance company personnel or any other persons or entities associated with the litigation to the representatives or agents of any of the foregoing . . . ." 46 La. ADC Pt XXI, § 1301(B)(9).

34.

The statutory framework provides no mechanism for active supervision of any kind by the State of Louisiana of the Board. The statute does not lay out a program for politically accountable institutions, such as the Louisiana Legislature or Louisiana Supreme Court, to review anticompetitive conduct by the Board or to actively review any potential punitive action taken by the Board against national or regional court reporting firms

35.

The United States Supreme Court and the United States Department of Justice have been clear that the ethical rules of professions cannot be used to prohibit price discounting or exclude competitors when those ethical rules are established and enforced by market participants who are not actively supervised by the state. *See North Carolina Board of Dental Examiners v. Federal Trade Commission*, 135 S.Ct. 1101 (2015); Guidance to National Association of Court Reporters, Department of Justice Business Review Letter (July 27, 1995), available at

https://www.justice.gov/atr/response-national-court-reporters-associations-request-business-review-letter (last visited September 10, 2017).  Defendants have paid no heed to this guidance.

36.

To the contrary, the vagueness of Article 1434 and Section 1301 permitted the Board to arbitrarily and capriciously use its regulatory authority to target national court reporting firms.

**DEFENDANTS' ACTIONS TO SUPPRESS PRICE COMPETITION**

37.

Although nothing in the language of Article 1434(A) suggests any intention by the Louisiana Legislature to supplant market-based price competition, the Board publicly announced in 2012, long after the adoption of Article 1434(A), that it intended to begin enforcing Article 1434(A) against court reporters who entered into volume discount contracts with party litigants. This announcement caused many certified court reporters to refuse assignments from and stop doing business with national and regional firms like Esquire out of fear the Board might take disciplinary action against them.

38.

The Board took these actions at the direction of the LCRA which controlled the Board through its officers, directors, and members who were members of the Board.

39.

For instance, at a Board Meeting on January 20, 2012, Peter Gilberti, a member of the LCRA Board, appeared in front of the Board to demand that the Board take immediate steps to promote Louisiana as a "Red State" which banned national court reporting firms that offered volume-based price discounts.  Mr. Gilberti explained that anti-contracting legislation in Louisiana had been motivated by "the sweet deals [that] were being made to big insurance and

defense firms" and that insurance companies are "not labeling [Louisiana] as a red flag state to skip, that they can't do business here." Mr. Gilberti beseeched the Board "to do something." Ex. 1 at 148:14-149:9.

40.

Mr. Gilberti demanded united and coordinated action by the LCRA and the Board "so that those insurance companies get the message that this association is ready to take on the responsibility as a State association to send out something to the insurance companies to let them be known or to the Insurance Commissioner for the State of Louisiana to get the message out." He concluded his statement by posing the question of whether the LCRA should take the lead in contacting the Insurance Commissioner "to get the message out" or "if this Board is a state agency, maybe they should be the ones." *Id.* at 148:14-149:9, 160:8-160:25.

41.

Following the statement by Mr. Gilberti, Board members Mr. Donegan and Mr. Borrello – the immediate past president of the LCRA – concurred with Mr. Gilberti and demanded aggressive enforcement action against court reporters who refuse to "to do the right thing":

MR. BORRELLO:
I know we've been using the phrase "national firms" or "1-800 firms." It could always be a local firm that's engaged in a contractual relationship, also.

MR. DONEGAN:
And we know that people do it.

JUDGE BONIN:
Well, you say that, but they never get here.

MR. DONEGAN:
No one will come forward.

MR. BORRELLO:
I tell that to the reporters who ask me that all of the time, and I say, you know, just like the police cannot investigate a crime unless you pick up the phone and say, "My house was robbed," the Board cannot investigate anything unless a complaint is made.

MR. DONEGAN:
They'll call, and when you ask them a name –

MR. BORRELLO:
That's the problem we've had, Judge.  I don't know if we've ever changed our rules, but people always say, "Well, if I can make an anonymous complaint, I'll do it, but I don't want to call and say who I am and say, "Jane Doe is not doing the right thing."

*Id.* at 156:14 – 157:15.  In response to these demands, counsel for the Board, David Marcello, recommended that the Board use its existing power to interpret its ethical rules to prohibit the "sweet deals" and sanction the court reporters who offer them.  *Id.* at 150:20 – 151:18.

42.

In the years following the January 20, 2012 meeting, the Board has become increasingly brazen in its efforts to suppress price competition among Louisiana court reporters and to shield them from competition from national court reporting firms.   At the direction of the Court Reporters, the Board has routinely used the subpoena power of the Board to discourage "sweet deals" for insurance companies.  In several instances, the Board issued broad and burdensome subpoenas to insurance companies for the express purpose of disrupting the commercial relationships between insurance companies and national court reporting firms like Esquire.  In order to be released from the subpoena, the Board demanded that these insurance companies publicly declare that they did not have exclusive contracts with court reporting firms like Esquire.  The Board posted one such letter, dated April 20, 2016, from Travelers, on its website under the heading "Confirming No Contract Exists."   http://lacourtreporterboard.org/pdfs/Travelers.pdf (last visited Sept. 11, 2017).

43.

The industry followed the Board closely.  In response to the posting of the Travelers' letter, an LCRA member posted the following statement on the wall of a Facebook group consisting of members of the LCRA and other court reporters – the Louisiana Voice Writers:

> I've got some great news Louisiana reporters. I had an insurance defense client that had to stop using me several years ago because their client demanded they use an out-of-state reporting agency, and today my client received an email from that agency stating that due to the severe restrictions that Louisiana has passed on its court reporters, they could no longer do their depositions for them. My client gets to start using me again!!!! I think if we are patient, they will slowly weed through these reporting firms that are cutting us out of jobs! Let's just keep our fingers crossed!

A true and correct copy of the posting is attached as Exhibit 2.

44.

The Board also has pursued investigations against court reporters suspected of accepting assignments from court reporting firms which offered volume discounts.  In response to prodding from the LCRA who asked for the Board to put violators on "the rack," the Board hired attorneys to investigate court reporters and opened formal investigations.  Transcript of April 29, 2013 Board Meeting at 200:15-217:7 (Board-001142 through Board-001159) (Exhibit 3).

45.

Acting through its Chairman, Judge Bonin, the Board also contacted Louisiana and non-Louisiana attorneys at the direction of the Court Reporters to inquire about whether they had received instructions from their clients to utilize certain court reporters.  *Id.* at 207:23 – 208:25 (Board-001149 through Board-001150).  In one instance, an attorney refused to speak with Judge Bonin and instead referred him to "their boss."  Judge Bonin "ended up on the phone on a conference call with lawyers across the country for that particular insurance company and asked them.  They told me they had no requirement." *Id.*

46.

On another occasion, at the direction of the Court Reporters, Judge Bonin successfully discouraged several insurance companies from seeking price discounts:  "And on the case, when I was working on it to cure the problem last year, I felt that I got a whole lot of cooperation from several insurance companies who I think were doing it.  I don't think they're doing it now. Nobody's told me about the problem with them, but if there's a problem, if you know of somebody, just tell us."  *Id.*

47.

In April 2016, at the direction of the Court Reporters, the Board began investigating national court reporting firms like Esquire.  As a prelude to enforcement of Article 1434(A)(2), the Board sent a "Notice of Investigation" and "Rule to Show Cause" to Veritext Legal Solutions.  In the "Rule to Show Cause," the Board purported to "order[ Veritext] to show cause ... at the [Board] meeting to be held on the 29th day of April, 2016 … why [it] should not be prevented from granting safe harbor affidavits in accordance with Louisiana Revised Statutes 46:1303."   Although the Board ultimately continued the show cause hearing without date, Veritext, Esquire, and other national court reporting firms doing business with court reporters in Louisiana remain in jeopardy of prosecution.

48.

In 2016, at the direction of the Court Reporters, the Board also commenced a campaign to facilitate price fixing agreements among court reporters.  The Board charged an ad hoc committee to investigate how to increase rates for court reporters in Louisiana and appointed the Court Reporters as the sole members of the committee.  Following this appointment, the Court Reporters solicited rate information from court reporters and publicly discouraged court reporters

from lowering their rates in social media postings.  The Court Reporters also scheduled a public

meeting of the ad hoc committee to discuss "How to increase rates?" and posted an agenda to its

website announcing its intention to discuss "How to increase rates?" at their next meeting.  A

copy of the agenda posted by the Board is attached as Exhibit 4.

49.

In connection with her efforts to raise rates, Defendant Methvin solicited rate information

directly from court reporters in a series of postings on Facebook and then shared her rate

information even though never asked.  She then explained that court reporters in Louisiana are

"all in the same neighborhood of rates" and that she wanted to be able to charge "double."  She

further stated her opposition to price discounting for insurance companies:  "And I don't think

any insurance company should be able to tell you what to charge for your work [unless] you are

directly employed by them.  That is frustrating to me.  Just a personal thought."  Defendant

Methvin received a positive response to her posting from a competing court reporter:  "I agree

with the insurance thing with all my heart. . . ."  These postings are attached as Exhibit 5.

50.

These Board actions have had the effect of intimidating court reporters and their

customers and stifled price competition for court reporting services in Louisiana.  The average

market price of court reporting on a per-page basis in the State of Louisiana is higher than in

many states where the cost of living is otherwise substantially higher.

**CONSPIRACY AMONG THE LCRA AND THE COURT REPORTERS**

51.

All of the anticompetitive conduct described above took place while the Court Reporters

controlled voting power on the Board and were serving as officers, directors, and members of the

LCRA.  During this entire time, the LCRA and Court Reporters explicitly and tacitly agreed with each other and with other members of the LCRA that they would not offer or permit their members to offer volume-based price discounts and that they would utilize their control over the Board to help implement this price fixing conspiracy.  These actions were never authorized by the Louisiana Legislature and reflect an agreement among private actors.

52.

Speaking on behalf of the LCRA, Peter Gilberti admitted to the agreement to eliminate price discounting in the following recorded statement to the Board:  "Well, and that was going to be my comment, Judge, is that we know that those big firms have not gone away.  The work is still going on in this State, so how are we going to find out who the reporters are engaging in this contracting? I mean, as firm owners, I – our reporters are upset that we had to give up a lot of this work, and they're not engaging in contracting anymore, but we know that a lot of reporters are, so who's policing this?"  Ex. 1 at 201:19-202:2 (Board-001143 through Board-001144).

53.

The agreement among the LCRA and Court Reporters also is reflected in efforts by the LCRA and the Court Reporters to conceal their joint efforts to suppress price competition.  In an email dated March 10, 2016, a court reporter wrote to the Court Reporters and other members of the LCRA to report that he had introduced himself to a lawyer at the last meeting of the Board and that he was concerned that the lawyer represented one of national court reporting firms because she refused to disclose the identity of her client.  The court reporter suggested requiring attendees at all meetings of the Board to identify themselves "and the firm or client they represent" in order to know whether national court reporting firms were monitoring their efforts

to prohibit price discounts.  A true and correct copy of the email communication is attached as Exhibit 6.

54.

As illustrated by the detailed allegations above, the Court Reporters actively engaged in anticompetitive conduct in their individual capacities in and outside the meetings of the Board and regularly used social media, email accounts, text messages, and telephones associated with their respective court reporting businesses to implement their plans and strategies to prohibit volume-based price discounts.  This conduct has had the anticompetitive effect of raising court reporting rates in Louisiana to levels significantly higher than they would have been without these restraints.

55.

Esquire is a consumer of court reporting services in Louisiana.  It regularly engages local Louisiana court reporters to perform work on behalf of Esquire and, therefore, has been forced to pay higher rates than it would have been in the absence of the restraints.  Esquire cannot pass these higher costs on to customers but must absorb them.  The anticompetitive effects of the restraints complained about above also have increased transaction costs for Esquire by making it more difficult to recruit Louisiana court reporters and to contract with customers.  All of these effects have reduced Esquire's margins, prevented Esquire from capturing additional market share, and resulted in lost profits and other damages.  Unless this conduct is restrained, Esquire will continue to suffer these injuries and will be excluded from the Louisiana market altogether.

**COUNT ONE - VAGUENESS**

56.

Esquire adopts and reincorporates each of the preceding allegations.

57.

Louisiana Code of Civil Procedure Article 1434(A)(2) and 46 La. ADC Pt XXI, § 1301 are so vague that Esquire is necessarily forced to guess about whether its contracts are proscribed.  The statute and regulation lack any definition of "contract" or other standards and provide no guidance about whether they: (1) prohibit all agreements between court reporters and party litigants; (2) require party litigants to engage court reporters through their attorneys; (3) prohibit long-term agreements; (4) prohibit court reporters from offering volume-based price discounts or service concessions to frequent customers; (5) prohibit referrals from court reporting firms; or (6) prohibit a combination of the above or entirely different forms of conduct.  As such, ordinary people cannot understand what conduct is prohibited by Article 1434(A)(2) and Section 1301 which has resulted in their arbitrary and discriminatory enforcement by the Board.

58.

Esquire is entitled to a declaration that Article 1434 and 46 La. ADC Pt XXI, § 1301 are unconstitutionally vague on their face or, alternatively, as applied and that they deprive Esquire of property without due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, to an injunction against the Board enjoining their enforcement and to an award of reasonable attorneys' fees and costs.

**COUNT TWO – EQUAL PROTECTION CLAIM**

59.

Esquire adopts and reincorporates each of the preceding allegations.

60.

As interpreted and enforced by the Board, Article 1434(A)(2) and 46 La. ADC Pt XXI, § 1301 draw an arbitrary and discriminatory classification between court reporters that offer volume-based price discounts to customers and those that do not.

61.

A ban against offering price discounts for court reporter services bears no rational relationship to any legitimate state interest in regulating the court-reporting industry.  It does not advance any of the goals for which the Board was created: it plainly has nothing to do with the "proficiency," "efficiency," or "competency" of Louisiana court reporters.  *See* La. R.S. 37:2551(A).  Nor does it serve any role in protecting the integrity of deposition transcripts. There are no reliable studies or reports to support the conclusion that transcripts produced by court reporters who discount their prices are more likely to be false, inaccurate, or biased toward a party than are transcripts produced by court reporters not working under contracts.

62.

Rather, the law was drafted at the urging of market participants with the express purpose of disadvantaging national court reporting firms, such as Esquire, by excluding them from the Louisiana market for court reporter services.  Moreover, in public statements, Defendants have admitted that the design, purpose, and effect of Article 134(A)(2) was to eliminate price competition from the Louisiana market by excluding national court reporting firms.

63.

As an LCRA board member told the Board on January 12, 2012, the legislation had been motivated by "the sweet deals [that] were being made to big insurance and defense firms."  *See* Transcript of January 20, 2012 Board Meeting at 148:14-149:9 (Exhibit 1).

64.

Further, none of the post-legislation justifications offered by the Board hold true.  For example, the Board claims that the legislation: (1) ensures that court reporters provide comparable services to all participants in a deposition and treat all parties fairly; (2) ensures that court reporters maintain the confidentiality of sensitive information contained in deposition; (3) protects the integrity of the record; (4) maintains court reporter integrity; and (5) avoids any appearance of impropriety or bias on the court reporter's behalf.  The statutory exemptions to the contracting prohibition demonstrate that these justifications are nothing more than pretexts.

65.

Federal, state, and local governments, as well as "parties in proper person" are excluded from the contracting prohibition.  A contract between a court reporter and a private party is no more likely to raise conflicts of interest than a contract between a court reporter and federal, state, or local government.  The same is true of a contract between a court reporting firm and a person without an attorney.  If anything, when all parties are represented by counsel, the risk that a party litigant will seek preferential treatment from a court reporter is lower than in cases where a *pro se* party may be dealing directly with a court reporter.

66.

Article 1434 also does not purport to prohibit contracting when depositions are conducted outside Louisiana.  However, a deposition taken inside Louisiana is no more likely to raise conflicts of interest than a deposition taken outside Louisiana.  The need to address potential conflicts of interest, if anything, would be greater when depositions are taken outside Louisiana and involve court reporters who may not be subject to disciplinary action in Louisiana.

67.

Moreover, the integrity of court reporters is already ensured by other statutory and regulatory provisions, including the provisions of La. Admin. Code Tit. 46, Part XXI, § 1103 requiring any court reporter who prepares a deposition transcript to read and certify its accuracy and the lack of any interest of the court reporter in the outcome of the case; the provision of La. R.S. 37:2557 permitting the Board to suspend or revoke a reporter's certificate on finding that the reporter engaged in "[f]raud, dishonesty, corruption, willful violation of duty, or gross incompetency in the practice of the profession," La. R.S. 37:2557(A)(1)(c); and other statutes that contemplate fines, imprisonment, and other criminal sanctions for persons who violate Louisiana's court-reporter regulations.  *See* La. R.S. 37:2558–2559.  Significantly, Article 1445 of the Louisiana Code of Civil Procedure provides an additional safeguard against inaccurate or purposely biased deposition transcripts by giving deponents themselves the option to read, revise errors in, and sign their deposition transcripts.  La. Code Civ. Proc. art. 1445.

68.

Esquire is entitled to a declaration that Article 1434 and 46 La. ADC Pt XXI, § 1301 violate the Equal Protection Clause in violation of the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, to an injunction against the Board enjoining their enforcement, and to an award of reasonable attorneys' fees and costs.

## COUNT THREE – DORMANT COMMERCE CLAUSE CLAIM

69.

Esquire adopts and reincorporates each of the preceding allegations.

70.

In order to access and participate effectively in the Louisiana market for court reporter services, court reporting firms located outside Louisiana must be able to recruit and hire Louisiana-licensed court reporters efficiently and at the lowest possible price. By increasing rates for court reporting services in Louisiana and prohibiting Louisiana court reporters from accepting assignments from national court reporting firms, Louisiana Civil Code Article 1434 and 46 La. ADC Pt XXI, § 1301 imposes commercial barriers to the Louisiana market for court reporting firms located outside the State. These commercial barriers do not exist for local court reporters because their proximity to the market significantly reduces their transaction costs.

71.

The impact on interstate commerce is not incidental. Companies spend billions of dollars on litigation transaction costs, independent of judgments awarded in disputes and settlements, every year. The most significant driver of these costs is discovery. The protectionism complained about in this lawsuit artificially increases litigation transaction costs for all litigants and is harmful to the administration of justice. It harms consumers of court reporting services in Louisiana by denying them the benefits of lower prices and higher quality services and harms solo and small-firm court reporters in Louisiana by denying them the opportunity to expand their businesses, reduce their administrative burdens and overhead expenses, and mitigate their risk of loss. The State had no legitimate purpose in prohibiting volume-based price discounts for court reporters and could have achieved any legitimate purpose through less restrictive means.

72.

Prohibiting price discounting also unlawfully discriminates against interstate commerce. National and regional court-reporting firms like Esquire, most of which are based outside

Louisiana, have been prohibited from negotiating and performing under contracts executed with their clients outside of Louisiana in proceedings pending before Louisiana courts, and clients who otherwise would have entered into a contract with a national or regional court-reporting firm have been made reluctant to do so by regulations like Article 1434(A)(2), which prevent those contracts from being effective in Louisiana.

73.

Esquire is entitled to a declaration that Article 1434 and 46 La. ADC Pt XXI, § 1301 violate the Dormant Commerce Clause of Article 1, Section 8 and the Fourteenth Amendment of the U.S. Constitution and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, to the extent that they prohibit volume-based discounting, to an injunction against the Board enjoining their enforcement, and to an award of reasonable attorneys' fees and costs.

## COUNT FOUR - SHERMAN ACT VIOLATION

74.

Esquire adopts and reincorporates each of the preceding allegations.

75.

The acts and practices described above constitute a naked per se restraint of trade or, alternatively, a restraint which fails the quick look and rule of reason analysis because the anticompetitive effects of the scheme substantially outweigh any procompetitive effects or justifications that the Board and Court Reporters may offer and less restrictive practices were available to the Board and Court Reporters to achieve any such procompetitive effects.

76.

Esquire has been directly harmed in its business and property by this anticompetitive conduct and is entitled to an injunction enjoining Defendants from continuing to engage in the acts and practices described above and to an award of reasonable attorneys' fees and costs.

77.

Esquire also is entitled to recover its financial losses from the Court Reporters and the LCRA including losses associated with decreased revenue, lower profit margins, increased costs, and loss of market share.

78.

Esquire is entitled to have these damages trebled and to recover its attorneys' fees, costs, and prejudgment and post-judgment interest under 15 U.S.C. § 15.

**PRAYER FOR RELIEF**

For the reasons above, Esquire prays for a trial by jury and relief as follows:

1.      A judgment in favor of Esquire and against the Board declaring that Louisiana Code of Civil Procedure Article 1434 and 46 La. ADC Pt XXI, § 1301 violate the Due Process, Equal Protection, and Dormant Commerce Clauses of the United States Constitution;

2.      A permanent injunction against the Board prohibiting enforcement of Louisiana Code of Civil Procedure Article 1434 and 46 La. ADC Pt XXI, § 130 for the purpose of discouraging, eliminating, or prohibiting volume-based price discounts by court reporters;

3.      A permanent injunction prohibiting the Court Reporters and the LCRA, and all those acting in concert with them from: (1) agreeing to fix or stabilize prices or discourage volume-based price discounts by court reporters, and (2) using their voting control of the Board to effect or police any agreement to fix or stabilize prices or discourage volume-based price discounts by court reporters;

4.      A judgment in favor of Esquire and against the Court Reporters and the LCRA for compensatory damages in an amount to be proven at trial and then trebled;

5.     A judgment in favor of Esquire awarding reasonable attorneys' fees, costs, and interest, and such further relief, in law and equity, as the Court may deem just and proper.

Respectfully submitted,

*/s/ Mark A. Cunningham*

MARK A. CUNNINGHAM (#24063) (T.A.)
ALEXANDER N. BRECKINRIDGE, V (#36155)
JONES WALKER LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8276
mcunningham@joneswalker.com
abreckinridge@joneswalker.com

***Attorneys for Esquire Deposition Solutions, LLC***